### DAVEY *v.* ÆTNA LIFE INS. CO.

*(Circuit Court, D. New Jersey. April 1, 1889.)*

1. INSURANCE—ACTIONS ON POLICIES—EVIDENCE.

   A physician's certificate of death, when made *ex parte*, is not proof of the cause of death as against the opposite party, but when explained and affirmed at the trial as to its statements by the physician who made it, it may be considered as part of the evidence.

2. POLICY—CONDITION—CONSTRUCTION.

   Where a policy of life insurance contains the proviso that if the insured "shall become so far intemperate as to impair his health, or induce *delirium tremens*," the policy shall become null and void, it is not necessary for the defendant to prove that the insured had become habitually intemperate for any length of time before his death, in order to avoid the policy; but the condition will be broken if it appear that the insured died from the effects of a

single drunken debauch, continued for one day, or ten days, immediately preceding his death, and although before that time he may have led a temperate, or even a strictly abstemious, life.

At Law.
*John Linn* and *Cortlandt Parker*, for plaintiff.
*Theron G. Strong* and *Joseph D. Bedle*, for defendant.

WALES, J., (*charging jury.*) This is an action of debt on a policy of insurance, dated July 16, 1878, issued by the Ætna Life Insurance Company of Hartford, Conn., to William A. Davey, whereby, in consideration of the representations and declarations made to the company in the application for the policy, and of the annual premium of $233.60, to be paid to the company on or before the 16th of July in each year during the continuance of the policy, the company insured the life of the said William A. Davey in the sum of $10,000, to be paid to his wife, Ada Davey, or, in the event of her death before his, to his executors, etc. The annual premiums were duly paid up to and including the 16th day of July, 1881; and shortly after the payment of the last premium, to-wit, on the 6th of August, 1881, the insured died, leaving his wife, the said Ada Davey, the plaintiff in this action, to survive him. Proofs of death of the insured, according to the form prepared by the company, were duly made and delivered to the company, and payment of the amount stated in the policy demanded, and, this payment having been refused, the plaintiff brought this action.

The excuse or justification made by the company for its refusal to pay the sum demanded is that the insured failed to observe and perform one of the conditions contained in and constituting a part of the contract of insurance, and thereby released the company from all obligation to pay the principal sum. These conditions are to be found in the third clause of the policy, and among them is one which provides that if the insured "shall become so far intemperate as to impair his health, or induce *delirium tremens*," the policy shall become null and void. By his contract with the company the insured accepted this condition, and agreed to lead a temperate life, and not to indulge in the use of alcoholic liquors to such an extent as to impair his health, or induce *delirium tremens*, and that, if he should break this condition, the contract between him and the company would be at an end, and the company would be no longer liable on its policy. It is alleged by the company that the insured violated this condition,—this part of his contract,—and that in consequence his health was impaired, and that his death was caused by intemperance or by *delirium tremens*, induced by his excessive indulgence in the use of alcoholic liquors. This, gentlemen, we understand to be the ground of defense to this action, and it will be your duty to seriously consider and weigh the evidence which has been submitted to you in support of the excuse and justification of the company in their refusal to pay the insurance money. The issue of fact is distinctly and broadly made, and the question for you to decide may be divided into two parts: First, had the insured, after the date of the policy, become so far intem-

perate as to impair his health; or did his intemperance cause or induce *delirium tremens?* If either of these questions is answered in the affirmative your verdict must be for the defendant, for in either case the insured, William A. Davey, would have broken his contract, and the plaintiff here cannot recover.

In the instructions now to be given to you we do not intend to review the evidence in detail, or to comment on the testimony further than may be proper to direct your attention to the history of the brief illness of the insured, which immediately preceded his death, so far as that history can be gathered or inferred from the statements of witnesses on both sides, and from the admissions of the insured himself. By way of introduction, it may be stated that at the date of the policy the insured was in the thirty-second year of his age, and at the time of his death was not yet thirty-five. He was therefore in the prime of life, and in his application for the policy represented himself to be of sober and temperate habits, and not addicted to the excessive or intemperate use of any alcoholic stimulants, or opium, and declared that he did not use any of them often or daily. It appears, however, from the testimony of Mrs. Davey, that, for some time previous to his last illness, he had not been in vigorous health, but complained of a cough and lung trouble, had taken medical advice, and had gone abroad for a few months with the hope of obtaining relief, but without deriving much benefit from the change. He was a manufacturer by occupation, and it was the chief part of his duty to attend to the financial branch of the business, conduct the correspondence, and visit Boston, Philadelphia, Baltimore, Rochester, and other eastern cities, at least once a year, in connection with the interests of his firm. It had been his custom for several years before and after his marriage, which was in 1876, to visit Alexandria Bay, in the state of New York, during the months of July and August, where he would remain for at least two weeks, engaged almost daily in boating and fishing. Subsequent to his marriage his wife had always accompanied him on his business trips and in these summer excursions, until the last one, when he went alone, his wife having been advised by her physician to seek the cooler atmosphere of the Catskills. Prior to this time, Mrs. Davey says that her husband had been temperate and moderate in the use of liquor; that she had never seen him intoxicated; and that by the direction of his doctor she had administered to him milk punches and sherry wine for the benefit of his health. His brothers, who were associated with him in business, and who saw him almost daily, also testify that they never saw him intoxicated or injuriously affected by the use of liquor. Mr. Van Horn, an intimate personal friend of the insured, and Mr. Matoone, an old friend of Mrs. Davey, both say that, so far as their observation went, the insured was never intoxicated. Mr. Davey arrived at Alexandria Bay on Saturday, the 23d of July, 1881, in the evening, and was met by Mr. Matoone and others, who assisted him to the Crossman House,—the hotel where he boarded during his stay. He was suffering from a sprained ankle, and walked with a shuffling gait. After reaching the hotel he was not in a condition to see any one, pre-

sumably from debility and the fatigue of his journey, and, at the suggestion of Mr. Matoone, retired to his room soon after supper. There is no direct or satisfactory evidence as to the condition of Mr. Davey's health at this time, and there is no proof that he was under medical treatment, or that he was afflicted with any special disease or complaint. On the day following his arrival he walked over to the Thousand Island House to call on Mr. Matoone, who had not then breakfasted, and passed some little time with that gentleman. On the same day he went out boating for a few hours. On Monday, the 25th of July, and on every succeeding day, with possibly the exception of Sunday, the 31st, he was out on the bay or river, boating and fishing, until Wednesday, the 3d of August, when he was discovered early in the morning in his room, at the Crossman House, prostrated by an attack of illness, which grew rapidly worse, and resulted in his death on Saturday, the 6th.

The certificate of death of the insured was made by Dr. Rae of Jersey City, his family physician, who had been summoned by telegram to attend him, and who answered as follows to the questions relating to the length of his acquaintance with the insured, and to the cause of his death. After stating that he had been called to attend Mr. Davey, on or about the 4th day of August, 1881, and continued with him until the day of his death, he says in reply to the first question:

"(1) How long have you known the deceased? About three years. (2) What was the direct cause of his death? Exhaustion from hematemesis. (3) What were the indirect causes of his death? Exposure to the sun and cirrhosis of the liver. (4) Was his last illness occasioned, or had his general health been impaired, by any pernicious habits? He was in the habit of using stimulants, and a great deal of tobacco. Probably they impaired his health. (5) Was his health impaired by intemperance? See answer to 4. (6) Was his death caused directly or indirectly from intemperance? See answer to 4."

On the presentation of this certificate to the proper officers of the company, it was not only right and proper, but it was incumbent on them, in the discharge of their duty, to inquire further into the circumstances attending the death of Mr. Davey, in order to ascertain whether or not he had fairly kept and performed his part of the contract. Having done this, they became satisfied that he had broken the condition to which your attention has been called; that the policy was thereby forfeited; and that the company was not liable for the amount insured. In taking this course the company cannot be censured or reflected on for adopting any unjust or oppressive measures to resist the payment of what they consider to be an illegal claim. There is certainly enough of doubt and uncertainty in this certificate, as it stands, as to the direct or indirect causes of Mr. Davey's death, to awaken suspicion; and there has also been sufficient evidence submitted to you by the company to justify them in laying the whole case before a jury, and asking for an impartial verdict. This certificate, of itself, and unexplained, is not conclusive evidence of the cause of death; nor is it *prima facie* proof against the plaintiff, for the reason that it was taken *ex parte*, and without opportunity for cross-examination; but it becomes a part of the evidence now to be con-

sidered by you, in so far as it has been explained by, and incorporated with the oral testimony of, Dr. Rae, who has been examined before you in reference to it, and who has substantially repeated and confirmed its statements. These statements are cautious, guarded, and somewhat indefinite, but not unfairly so, because it is the privilege and right of every physician, under similar circumstances, in the absence of a *post mortem* examination, to qualify his opinion or judgment of the cause of his patient's death. In giving his opinion, Dr. Rae says that he was guided by his own observation, and by the statements made to him by Dr. Watson, the local physician, who had been called in before his arrival. The certificate gives as the cause of death hematemesis,—the vomiting of blood from the stomach,—which is one of the symptoms of cirrhosis of the liver,—that is, a condition of the liver produced in a large proportion of cases by the excessive or intemperate use of alcoholic liquor for any considerable length of time. Dr. Rae is an intelligent physician, and gave his testimony with apparent candor. He had known the deceased for three years, had attended him professionally, and, as the result of his observation and knowledge, tells you, after certifying the cause of death according to his best judgment, that Mr. Davey was in the habit of using stimulants, and a great deal of tobacco, and that they probably impaired his health.

We have thus particularly directed your attention to the certificate of death, and to the testimony of Dr. Rae in conjunction therewith, because they together will form the starting point in your investigation of the actual and real cause of Mr. Davey's death. You have heard the testimony of Dr. Watson, who was called to see the insured on Wednesday morning, when he was first discovered laboring under the attack which proved fatal, and you will recall his narration of the condition in which he found Mr. Davey, and of what he said about himself. You will not fail to remember the declarations of Mr. Davey, his confession, indeed, that he had been cautioned by his family physician that unless he would stop drinking he would be liable to these attacks, and that he supposed it was all up with him now. Then there is the testimony of Dr. Bruce, who, in the months of July and August, 1881, was acting in the capacity of clerk in the Crossman House, and at the same time was pursuing the study of medicine, and is now a practicing physician, and who saw Mr. Davey very often during his illness. And, finally, there is the evidence of several other persons, boatmen, bar-keepers, and bell-boy, who had known Mr. Davey for various periods during his annual sojourns at Alexandria Bay, extending in some cases as far back as seven or eight years before his death; and they told you what they knew in reference to his habits of drinking while there, especially on the occasion of his last visit. One of these witnesses—the oarsman who attended Mr. Davey every day from the 24th of July to August 3, 1881—says that he warned Mr. Davey that "if he didn't stop drinking so much he would kill himself, and was told to mind his own business." In addition to the witnesses who speak from personal observation and knowledge of Mr. Davey's habits, there is the expert testimony of Drs. Phil-

lips and Ward, who gave their professional opinion and judgment on the effects of the supposed quantities of liquor taken by Mr. Davey during the eight or ten days preceding his prostration, and also what in their opinion, after hearing the testimony of Drs. Watson and Rae, and of the other witnesses, was the cause of his death. On this evidence, which we have briefly passed in review, the defendant's case rests, and it is claimed by the company to have proved the fact that Mr. Davey violated his contract by becoming so far intemperate as to impair his health, and so rendered the policy void. By way of rebuttal, the plaintiff has produced testimony to show that Mr. Davey had always been, at least subsequent to the date of the policy, and up to the time of his death,—that portion of his life with which we are now more particularly concerned, —a sober man. This testimony comes from the wife and brothers of Mr. Davey, and from two family friends, Mr. Matoone and Mr. Van Horn, none of whom, however, saw him during his last visit at Alexandria Bay, until he was in a dying condition, excepting Mr. Matoone.

Now, gentlemen, you are to consider all the testimony that has been offered by the plaintiff and defendant on this question of the alleged violation of his contract by Mr. Davey, for it is your province to decide on the facts which have been established on the one side or the other. If, after a careful and conscientious examination of the whole evidence, you shall be satisfied that Mr. Davey did, after the date of the policy, become so far intemperate as to impair his health, or induce *delirium tremens*, your verdict must be for the defendant, but if you shall not be so satisfied, then the plaintiff will be entitled to a verdict for the full amount of the policy, with interest. It is not necessary, in making up your verdict, that you should be satisfied beyond a reasonable doubt of any fact or facts in reference to which evidence has been given in the course of the trial. You are only required to be governed by the weight of the testimony, and on whichever side that weight preponderates your verdict must be rendered.

As you have already been informed, at a former trial of this cause a verdict was rendered for the plaintiff; but, the judgment entered on that verdict having been reversed by the appellate court[1] in consequence of the erroneous construction, given to the jury in the former trial, of the words, "so far intemperate as to impair his health," the cause has been remanded here to be tried over again under the interpretation put upon those words by the supreme court of the United States. Of course, if the evidence which you have heard satisfies you that Mr. Davey died from *delirium tremens*, then there can be no doubt that the policy was thereby forfeited, and the plaintiff cannot recover; but if you shall not be satisfied that he died from that cause, then your attention must be directed to the meaning and import of the words "so far intemperate as to impair his health," and, in order that you may clearly understand the interpretation of that phrase as announced by the supreme court, we will read that portion of the opinion of the court which defines and ex-

[1] 8 Sup. Ct. Rep. 331.

presses what these words mean.    The court, speaking through Mr. Justice HARLAN, says:

"If the substantial cause of the death of the insured was an excessive use of alcoholic stimulants, not taken in good faith for medical purposes, or under medical advice, his health was impaired by intemperance, within the meaning of the words 'so far intemperate as to impair his health,' although he may not have had *delirium tremens*, and although, previously to his last illness, he had not indulged in strong drink for such a long period of time, or so frequently, as to become habitually intemperate.    Whether death was so caused is a matter to be determined by the jury, under all the evidence."

This language is plain, unequivocal, and cannot be misunderstood. If, therefore, Mr. Davey died from a single debauch, continued for one day or for ten days, he did become "so far intemperate as to impair his health," although he had, previously to his last illness, led a temperate, or even strictly abstemious, life.    This construction of the words contained in the third clause of the policy is binding on this and on all other federal courts, and it is your duty, as well as ours, to obey it.    You are the judges of the facts and of the credibility of the witnesses, but you must give your obedience to the law as announced by the highest tribunal in the land.    In what we have now said to you, we have endeavored to substantially embrace all the requests for special instructions made by the counsel for the plaintiff and defendant respectively, with perhaps one exception, which is this:    That in your deliberations you will not be influenced or controlled by any motives of sympathy or prejudice for or against either of the parties to this action, but that you will render a verdict according to the evidence,—a just and impartial verdict, which will command the approval of your own consciences.

Verdict for the plaintiff.